FF COSMETICS FL INC., a Florida corporation doing business as Forever Flawless Cosmetics 1; Timeless Cosmetics FL Inc., a Florida corporation; Brilliance New York, LLC, a New York limited liability company, f/k/a/ Brilliance New York, Inc.; and Oceane FL Cosmetics Inc, a Florida corporation doing business as Tresor Rare, Plaintiffs,

v.

CITY OF MIAMI BEACH, FLORIDA, a Florida municipal corporation, Defendant.

CASE NO. 14-cv-22072-KING

United States District Court, S.D. Florida.

Signed 08/31/2015

Daniel Robert Aaronson, James Scott Benjamin, Benjamin & Anderson, Fort Lauderdale, FL, Gary Scott Edinger, Benjamin, Aaronson, Edinger & Patanzo, P.A., Gainsville, FL, for Plaintiff.

Jason Patrick Kairalla, Richard J. Ovelmen, Enrique Daniel Arana, Scott Everett Byers, Carlton Fields Jorden Burt, P.A., Robert F. Rosenwald, Jr., Donald Mark Papy, City of Miami Beach, Miami Beach, FL, for Defendant.

### PRELIMINARY INJUNCTION

JAMES LAWRENCE KING, UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

THIS CAUSE comes before the Court upon Plaintiffs' Renewed Motion for Preliminary Injunction (DE 27). The Court held a preliminary injunction hearing, which lasted five days and was spread out over three months. The Court renders this opinion with the benefit of having heard live testimony, documentary evidence, and oral arguments. For the reasons that follow, Plaintiffs' motion is granted and a preliminary injunction is entered.

### I. Background

Each Plaintiff operates a store in Miami Beach, Florida, as an authorized retailer for specialty cosmetics, skin care, and beauty products. Their storefronts are on Lincoln Road, in the City's historic district. Lincoln Road runs several blocks, lined on either side with shops and restaurants. The road is closed to cars and other motorized vehicles such as Segways. Bicycling and skateboarding are prohibited during certain hours. Pedestrians roam freely. Chairs and tables belonging to sidewalk cafes and restaurants sprawl out from the buildings' facades or take up space in the middle of the road. *See* TR 04/29, at 94:12-14.[1] It is a popular tourist destination, teeming with visitors daily.

Plaintiffs have a common business model that depends on soliciting these visitors, particularly the tourists, who stroll past their stores. To attract their attention, Plaintiffs employ one, two, or three "greeters" who stand in front of their stores, calling out to passersby with salutations, such as "Hi, how are you?" and "Where are you from?" They express compliments or ask questions such as "What do you use for your eyes?" They make entreaties, such as "I will give you a free sample" or "would you like to have a free demonstration?" They distribute handbills. This behavior has been variously referred to as

---

1. The Court will cite to the transcripts as follows: "TR" followed by the date of the transcript, followed by page and line number. For example, text appearing on the third line of the third page of the transcript of April 29, 2015, would be cited as "TR 04/29, at 3:3."

greeting, hawking, barking, or soliciting. Whatever its proper label, the purpose of this behavior is clear: to get passers-by to bend their steps into Plaintiffs' stores to buy their products.

The City wants all of this to stop. Because it's not just the Plaintiffs. It seems many businesses on Lincoln Road, Ocean Drive, and elsewhere in the City's historic district, particularly the restaurants and cosmetics stores, employ people to stand outside and cat-call the walking public, who in turn complain to the City. The phenomenon of all these greeters is annoying to some—annoying to have their day of strolling, shopping, and leisure interrupted every twenty paces by another greeter handing them something, enticing them with fifty-percent-off meals, or commenting on their looks. Some people feel harassed or embarrassed. Their annoyance is compounded by the ubiquity of these greeters. One witness described walking down Lincoln Road as having "to come through a gauntlet." [2] TR 07/28, at 79:17-20. Another described the constant barrage of handbills as "death by paper cut." TR 07/27, at 80:10-11. The City, protective of its aesthetics and of its attractiveness as a tourist destination, fears annoyed pedestrians.

So the City started enforcing two sections of its Code of Ordinances: Section 74-1, an anti-soliciting ordinance, and Section 46-92, an anti-handbilling ordinance. Broadly speaking, the ordinances prohibit soliciting and handbilling in the public right-of-way within certain streets and other areas of the City's historic district—what one witness called "the entertainment district"—which includes Lincoln Road, where Plaintiffs operate. TR 07/27, at

69:20-21.[3] Plaintiffs received several citations for violating the ordinances, incurring fines ranging from $50 to $250. Yet their employees kept greeting, and the citations kept coming. TR 04/29, at 117:21-118:5. The City threatened at least three of the plaintiffs that they risked their occupational licenses if their employees did not stop. TR 04/29, at 42:25-43:5; TR 07/27, at 163:4-11.

Aggrieved at being fined for speaking in public, the plaintiffs sued on June 5, 2014, to enjoin the City from enforcing the two ordinances, claiming injury to their First Amendment rights. A little less than six months into the litigation, the City amended the ordinances. The amendments, which became effective on November 29, 2014 (DE 24 ¶ 3), prompted Plaintiffs to file an Amended Complaint (DE 26).

Plaintiffs also filed a Renewed Motion for Preliminary Injunction, which targets only the amended versions of the ordinances. *See* DE 27, at 6 ("this Motion will concentrate on the current, amended version[s] of both Ordinances"). Whether Plaintiffs succeed in pursuing their injunction or not, they may still have viable claims for monetary damages suffered under the prior versions of the ordinances. Unless otherwise noted, all discussion of the ordinances in this opinion concerns the amended versions.

## II. Standard for Preliminary Injunction

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant out-

---

2. He meant "gantlet." *See* Patricia T. O'Conner, Woe Is I 101 (2004) ("You run the *gantlet*, but you throw down the *gauntlet*.").

3. A map detailing the area covered by the ordinances was introduced as part of Defendant's Exhibit 3, and is also found at DE 35-42. It is attached to this opinion as Appendix 1.

weighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The Court turns first to the merits question.

## III. The Anti-Solicitation Ordinance Regulates Plaintiffs' Commercial Speech

The anti-solicitation ordinance (Section 74-1) reads, in pertinent part, as follows: (a) *Prohibitions*. It shall be unlawful to solicit any person for the purpose of inducing such person to purchase any property, real or personal, or any food, beverage or service, or to solicit such person to enter any place of business for the purpose of inducing or attempting to induce such person to purchase any property, real or personal, or any food, beverage or service.

This Section shall apply when the solicitor or the person being solicited is located on any public right-of-way, which means and includes, but is not limited to, any street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway, in any of the following areas in the City of Miami Beach. This Section shall also apply to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way, in [certain streets and other areas of the City's entertainment district. *See* Appendix 1. The full text of this ordinance and its amendments are attached to this opinion as Appendix 2.]

The parties present an initial question of what framework to use in analyzing this ordinance. Plaintiffs argue that it proscribes more than commercial speech, and is therefore subject to an overbreadth attack. *See Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). It cannot be disputed, however, that the ordinance significantly proscribes commercial speech, which includes Plaintiffs' speech on the public right-of-way.

Commercial speech has been variously described as speech which does "no more than propose a commercial transaction,'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)), or as "expression related solely to the economic interests of the speaker." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Such speech is "the offspring of economic self-interest," *id.* at 564 n. 6, 100 S.Ct. 2343, analytically separated from other varieties of speech by a "commonsense distinction." *Id.* at 562, 100 S.Ct. 2343 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (internal quotation marks omitted)). In this way, commercial speech is not a "rigid classification[]," dependent on any definite set of characteristics. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 81, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (Stevens, J., concurring in the judgment).

Whatever form the greeters' speech takes, their engagements with the walking public have one underlying message and one object, albeit often indirectly stated: to have prospects enter their stores and purchase Plaintiffs' products. The Court here makes a commonsense distinction: Plaintiffs' speech is commercial speech.

The Court is mindful that "the lawfulness of the particular application of the law should ordinarily be decided first." *Fox*, 492 U.S. at 485, 109 S.Ct. 3028. Because Plaintiffs' speech is commercial

**1322**

speech, and because of the limitations found in the ordinance's plain language, (described in Part III.D.1., below), the Court finds it proper to take the ordinary route; that is, the Court will analyze this ordinance as applied to Plaintiffs' commercial speech, under the Supreme Court's four-part framework for commercial speech articulated in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Court will take a different route with the anti-handbilling ordinance. *See* Part IV, below.

## A. Plaintiffs' Commercial Speech is Neither False nor Misleading

■ "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." *Cent. Hudson*, 447 U.S. at 566, 100 S.Ct. 2343.

■ The City leans heavily on this initial question. It claims that Plaintiffs' "sales pitch" is false and misleading, i.e., that Plaintiffs' salespersons tell misrepresentations and outright lies about Plaintiffs' products to prospective customers. Particularly, among the products that Plaintiffs sell are those that boast of containing diamond dust, which ostensibly provides various health or beauty benefits to those who use them.[4] For example, employees of some of the Plaintiffs tell customers that certain products help to produce collagen, and that diamonds in the products allow ingredients to be delivered

through the pores of the skin. TR 04/29, at 124:6-17. The City's expert, Dr. Bryan Fuller, a skin biochemist, explained in a manner that was scientific, sober, and most of all credible, that these propositions, among other claims to the salutary effects of some of Plaintiffs' products, and diamond dust in particular, are preposterous.

The parties filed several pretrial motions related to this issue and the City explored it at length during the preliminary injunction hearing. The information on what Plaintiffs' employees said, so that the Court might evaluate whether such statements were false and misleading so as to lose First Amendment protection, came from three sources: (1) Plaintiffs' testimony; (2) testimony from those who observed Plaintiffs' employees; and (3) transcripts of secretly recorded conversations with Plaintiffs' employees.[5]

At the end of the preliminary injunction hearing, one conclusion is inescapable: The most that anyone ever heard Plaintiffs' greeters say outside their stores, on the public right-of-way, were the various salutations, entreaties, and comments described earlier, such as "Hi, how are you?" and "Where are you from?" Their remarks notably lacked of anything false or misleading. None of the witnesses, including those called by the City, testified to any false statements on the public right-of-way.

These facts, in light of the plain language of the ordinance, resolves the first prong of the *Central Hudson* inquiry in

---

4. The Court notes, without accepting as true (no evidence was offered on this point at the preliminary injunction hearing), Plaintiffs' representation that "Timeless Cosmetics no longer markets any line of cosmetics with diamond powder. Tresor Rare continues to market diamond-based cosmetics but it represents only a small portion of their product line." DE 75, at 12 n.11.

5. The Court admitted some but not all of these transcripts, recorded in Florida with only one-party consent, as a matter of federal evidence, with no comment on their propriety—or lawfulness—in any other regard. *See* Fla. Stat. 934.01 *et seq.*

Plaintiffs' favor. The ordinance draws a distinction between solicitations on the public right-of-way[6] (which are proscribed) and solicitations anywhere else (which are not). As this Court observed previously, "[s]peech on or directed to those on the public right-of-way is what the ordinances proscribe. That is the speech for which the Plaintiffs face government citations, fines, and threats. That is the speech for which Plaintiffs seek protection. It is the character of that speech that is central to Plaintiffs' as-applied claim and to this Court's inquiry." DE 95, at 3 (footnote omitted). What false or misleading statements Plaintiffs' employees may have uttered inside their stores is of no moment as far as the ordinance is concerned. Because Plaintiffs' speech outside their stores was neither false nor misleading, it is entitled to that "qualified but nonetheless substantial protection accorded to commercial speech." *Bolger*, 463 U.S. at 68, 103 S.Ct. 2875.

Even assuming the relevancy of Plaintiffs' speech *inside* their stores,[7] and even assuming that employees of some of the Plaintiffs made some false or misleading statements about some of their products inside their stores, the City has not demonstrated that Plaintiffs' speech was mostly, or even often, false or misleading.[8] The ordinance does not distinguish between false or misleading solicitation and other kinds of solicitation; and "where, as with the blanket ban involved here, truthful and nonmisleading expression will be snared

along with fraudulent or deceptive commercial speech, the [City] must satisfy the remainder of the *Central Hudson* test by demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Edenfield v. Fane*, 507 U.S. 761,768–69, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

## B. The City's Asserted Interests are Substantial

A regulation of commercial speech must serve a legitimate, substantial interest. "To find a 'substantial interest,' a court must conclude both that the interest advanced by the state is legitimate in theory, *and* that that interest is in remedying a problem that exists in fact (or probably would exist, but for the challenged legislation)." *Sciarrino v. City of Key West, Fla.*, 83 F.3d 364, 367 (11th Cir.1996). Although the City "may not rely on 'mere speculation or conjecture'" to justify the ordinance, neither must it "present 'empirical data ... accompanied by a surfeit of background information.'" *Falanga v. State Bar of Ga.*, 150 F.3d 1333, 1340–41 (11th Cir.1998) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995)).

The City asserts ten interests to support the challenged ordinances:

(1) protecting the historic character of the District, the City's economic engine; (2) developing the high-end retail and high-end sidewalk cafe promenades in the District; (3) promoting luxury tour-

---

**6.** The ordinance's reach is not really limited to the public right-of-way, as explained in Part III.D.1., below.

**7.** It is not clear that all of the Plaintiffs operate this way, but at least one of the Plaintiffs testified to a division of labor whereby its greeters do not follow the customers inside the store, but rather pass them off to a different employee and resume their greeting duties outside.

**8.** This failure results in no small part because transcripts of secretly recorded conversations were admitted only as to Plaintiffs Brilliance New York (Defendant's Exhibit 6) and Forever Flawless (Defendant's Exhibits 7 and 8). The Court admitted no evidence of any statements made inside the stores of Oceane (Tresor Rare) or Timeless Cosmetics.

ism; (4) minimizing harassment of pedestrians along the public right-of-way; (5) minimizing congestion; (6) reducing litter; (7) improving the aesthetic experience of the District for residents and visitors; (8) protecting the right of pedestrians to be left alone in their quiet enjoyment of these districts; (9) maintaining the unique ambiance the City has created in these sectors; and (10) the expansion of other areas where commercial solicitation is allowed within the City.

DE 37, at 12-13.

Without parsing each asserted interest (some of which overlap), the Court readily concludes that the City has asserted interests that are "legitimate in theory." *Sciarrino*, 83 F.3d at 367; *see also Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *Edenfield*, 507 U.S. at 769, 113 S.Ct. 1792 ("Even solicitation that is neither fraudulent nor deceptive may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient. In *Ohralik*, we made explicit that 'protection of the public from these aspects of solicitation is a legitimate and important state interest.'") (quoting *Ohralik*, 436 U.S. at 462, 98 S.Ct. 1912).

The City also presented substantial witness testimony to show that its asserted interests are "in remedying a problem that exists in fact." *See Sciarrino*, 83 F.3d at 367. For example, Jessica Elmaleh, who owns a shoe store next to Brilliance New York, testified that she has seen Brilliance's greeters follow people down the street and touch people's hair. TR 04/29, at 58:7-20. She has also seen them approach people who are standing in front of her shoe store. *Id.* at 60:5-7. She often crosses

the street to avoid the greeters, "mak[ing] a detour just not to be bothered." *Id.* at 61:3—4. Jeffrey Weinstein, Director of Development for a Lincoln Road business, has seen Plaintiffs' greeters "stop people in the middle of their stroll" and "chase after them in certain cases." TR 07/28, at 82:18-22. Mark Ehrlich testified that one of Plaintiffs' greeters told him he had a nice face but it was marred by "blackheads." TR 07/28, at 112:17-22. This embarrassed him. *Id.*

Jose Jimenez, the former Assistant City Manager for Miami Beach, testified not only that he received many complaints about soliciting and handbilling, but that he personally experienced excessive soliciting and handbilling. "It was like death by paper cut," he said. TR 07/27, at 80:10-11. Hernan Cardeno, Director of Miami Beach's Code Compliance Department, testified that he had to draw personnel and financial resources away from other City districts to the entertainment district to deal with the solicitation problem. TR 07/28, at 38:20-39:3.

Sasha Perisic, a neighboring restaurateur, testified that greeters from Timeless Cosmetics stand outside every day (although they don't bother him). TR 04/29, at 24:8-9. Pedro Igrejas, the general manager of a neighboring business, testified similarly about Brilliance New York's greeters. *See* TR 04/29, at 100:12-13; *see also* TR 07/27, at 171:3-7.

The Court credits substantial witness testimony adduced at the preliminary injunction hearing to the effect that solicitations and handbilling in Miami Beach's historic district is a problem that exists in fact, and that it causes annoyance and aesthetic harm.

### C. The Anti-Solicitation Ordinance Directly Advances the City's Interests

 The City must "'demonstrate that the challenged regulation advances

[its asserted] interest[s] in a direct and material way.'" *Harrell v. Fla. Bar*, 608 F.3d 1241, 1270 (11th Cir.2010) (quoting *Went For It, Inc.*, 515 U.S. at 625–26, 115 S.Ct. 2371) (alterations in original). "Both the Supreme Court and [the Eleventh Circuit] have noted that anecdotal evidence may support a conclusion that the challenged regulation directly and materially serves the State's substantial interest." *Wollschlaeger v. Governor of Florida*, 797 F.3d 859, 898 (11th Cir.2015). Furthermore, "a partial solution to a city's aesthetic problems may still directly advance the city's goals. The Constitution does not require the City to choose between curing all of its aesthetic problems or curing none at all." *Don's Porta Signs, Inc. v. City of Clearwater*, 829 F.2d 1051, 1053 (11th Cir. 1987).

▮▮▮ Much for the same reasons that the Court finds the problem of soliciting to exist in fact, the Court finds that the ordinance directly advances the City's interest in remedying the problem. The City adduced sufficient evidence, albeit some in the form of anecdotes or loose observations, that the anti-solicitation ordinance has helped to reduce solicitations in the City's historic district. *See* TR 07/27, at 76:12-13, 110:8-111:2; TR 07/28, at 41:11-18. The Court may also comfortably rely on the facial plausibility that an ordinance prohibiting solicitation tends to chill solicitations.[9] That it does so is the very basis of Plaintiffs' Amended Complaint.

---

**9.** *Cf. Wollschlaeger*, 797 F.3d at 898 (accepting Florida's direct-advancement argument "given the facial plausibility of the legislature's conclusion" "that proscribing highly intrusive speech that physicians themselves do not believe to be relevant or necessary directly advances the State's interest in protecting its citizens from harmful or ineffective professional practices and safeguarding their privacy.").

**10.** This inquiry dovetails with the otherwise-employed "time, place, and manner" analysis;

## D. The Ordinance Reaches Further Than Necessary

▮▮▮ "The last element of the *Central Hudson* analysis inquires whether the statute reaches farther than is necessary." *Sciarrino*, 83 F.3d at 370. This is "the critical inquiry." *Central Hudson*, 447 U.S. at 569, 100 S.Ct. 2343. The First Amendment requires

a " 'fit' between the legislature's ends and the means chosen to accomplish those ends," ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," ... that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.

▮▮▮ *Fox*, 492 U.S. at 480, 109 S.Ct. 3028 (internal citations omitted).[10] The cost to Plaintiffs' First Amendment interests of advancing the City's legitimate goals must be "carefully calculated." *Id.* at 481, 109 S.Ct. 3028. The City bears the burden of justifying its restrictions; it must "affirmatively establish the reasonable fit."[11] *Id.*

▮▮▮ The Court concludes that the anti-solicitation ordinance reaches further than necessary—a conclusion compelled by a plain reading of the ordinance, evidence adduced at the preliminary injunction hearing, and Eleventh Circuit and Su-

---

for "[w]here a restriction on speech lacks this close and substantial relation to the governmental interests asserted, it cannot be, by definition, a reasonable time, place, or manner restriction." *Edenfield*, 507 U.S. at 773, 113 S.Ct. 1792.

**11.** The City bears this burden even at the preliminary injunction stage. *See Chase v. Town of Ocean City*, 825 F.Supp.2d 599, 617 (D.Md.2011).

preme Court precedent. The ordinance is a blanket ban, disfavored in the law; and the City has failed to meet its burden of demonstrating the inadequacy of less-intrusive alternatives. The cost of the ordinance to Plaintiffs' First Amendment interests is too high. Plaintiffs have shown a substantial likelihood of success on the merits of their claim that, as applied to their speech, Miami Beach's anti-solicitation ordinance violates the First Amendment.

### 1. The Ordinance is a Disfavored "Blanket Ban"

In *Fane v. Edenfield*, the Eleventh Circuit was confronted with a Florida statute that banned in-person solicitations by certified public accountants. 945 F.2d 1514, 1517 (11th Cir.1991) *aff'd*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). A certified public accountant ("CPA") challenged the statute as "an unconstitutional restriction of commercial speech." *Id.* at 1516. The district court, at the summary judgment stage, enjoined the State from enforcing the ban. The Eleventh Circuit affirmed, explaining that "[b]lanket prohibitions on commercial speech are disfavored.... The mere possibility that isolated abuses or mistakes may occur does not justify a total ban on a certain mode of protected commercial speech." *Id.* at 1517 (citing *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 476, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988)); *see also Cent. Hudson*, 447 U.S. at 566 n. 9, 100 S.Ct. 2343 ("in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity."); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) ("blanket bans on price advertising by attorneys and rules preventing attorneys from using nondeceptive terminology to describe their fields of practice are impermissible.").

This principle holds when applied to the facts of this case, albeit the State in *Fane* was concerned with a different quality of abuses by CPAs than the City is here by solicitors and handbillers. The anti-solicitation ordinance at issue here must be considered a blanket ban. True, the ordinance's reach is limited in certain respects. It is limited geographically—namely, to the public right-of-way (and certain places adjacent to the public right-of-way) within certain areas of the City's historic district. *See* Appendices 1 and 2. Also, the ordinance prohibits only a certain kind of solicitation—"to solicit any person for the purpose of inducing such person to purchase any property, real or personal, or any food, beverage or service, or to solicit such person to enter any place of business for the purpose of inducing or attempting to induce such person to purchase any property, real or personal, or any food, beverage or service."

However, a plain reading of the ordinance also reveals that it is not limited in critical respects. By the phrase "it shall be unlawful to solicit any person," the ordinance's prohibition on solicitation is, within its geographical limits, absolute—all persons are prohibited from soliciting all persons. The ordinance does not distinguish between solicitations that are invited and those that are uninvited. Nor does it distinguish between solicitors who are businesses (or their employees, agents, etc.) and those who are not. The ordinance does not distinguish between oral solicitations and non-oral solicitations. Neither does the ordinance distinguish between solicitors who know the person whom they solicit and solicitors who are strangers to the person whom they solicit. The ordinance does not distinguish between false and misleading solicitations and truthful, non-misleading solicitations. Importantly, the ordinance does not limit its prohibition to solicitations that impede pedestrian traffic,

are too loud, or are otherwise harassing or vexatious. The ordinance is also not limited to the public right-of-way; for the ordinance, by its plain terms, applies "to any doorway, stairway, window, or other opening of a building abutting on or adjacent to such right-of-way." Thus the ordinance reaches into private interests in real property.

For all of these reasons, and although the ordinance bans only a type of solicitation, it is still properly construed as a disfavored "blanket ban"—that is, "a total ban on a certain mode of protected commercial speech." *Fane*, 945 F.2d at 1517 (citing *Shapero*, 486 U.S. at 476, 108 S.Ct. 1916). The fact that its reach is geographically limited does not gain it favor, for reasons more fully developed in Part III. D.3., below.

## 2. The City has Failed to Carry its Burden on Less-Intrusive Alternatives

"The burden to justify the extent of the restrictions... remains with the would-be regulator." *Sciarrino*, 83 F.3d at 370. The City may carry its burden "[i]f the means reasonably advance the goal and there is no evidence in support of a finding that less restrictive means are available." *Harnish v. Manatee Cnty., Fla.*, 783 F.2d 1535, 1540 (11th Cir.1986). "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), but "the court should not attempt to speculate as to whether less restrictive means exist." *Harnish*, 783 F.2d at 1540. "The issue is whether the City has successfully 'demonstrated that its interest... cannot be protected adequately by more limited regulation of [Plaintiffs'] commercial ex-

pression.' " *Sciarrino*, 83 F.3d at 370 (quoting *Central Hudson*, 447 U.S. at 570, 100 S.Ct. 2343). Whether the City can so demonstrate is at the heart of whether it can show, as it must, "a careful effort... to draw a balance between the commercial speech rights of the proprietors and the problems the Ordinance addresses." *Id.*

In *Fane v. Edenfield*, for example, the Eleventh Circuit noted that "[r]egulatory requirements exist in Florida that can be utilized to preserve the independence of CPAs who perform the attest function." 945 F.2d at 1518–19. The Court faulted the Board of Accountancy for failing to "offer any explanation as to why those requirements do not adequately afford the protection which it seeks." *Id.* at 1519. The Court concluded that "[t]he Board has the duty to at least explore less intrusive alternatives than a blanket ban on in-person solicitation imposed on all CPAs." *Id.* (citing *Shapero*, 486 U.S. at 477–78, 108 S.Ct. 1916).

The City has failed to meet its burden. Substantial testimony revealed that there are "numerous and obvious less-burdensome alternatives" to the City's blanket ban. In the face of such testimony, and in the light of the Eleventh Circuit's *Sciarrino* decision, the City has not " 'demonstrated that its interest... cannot be protected adequately by more limited regulation of [Plaintiffs'] commercial expression.' " *Sciarrino*, 83 F.3d at 370 (quoting *Central Hudson*, 447 U.S. at 570, 100 S.Ct. 2343).

The parties both rely on *Sciarrino* to argue whether less-restrictive alternatives are available to the City. In that case, this Division of Court, and the Eleventh Circuit on appeal, upheld a Key West anti-soliciting and anti-handbilling ordinance as a valid regulation of commercial speech.

The Court has reviewed the full text of Key West's ordinance, with its amend-

ments. However, as a matter of following precedent, the Court perceives an error in consigning the analysis of this prong of the *Central Hudson* inquiry to a comparison of Key West's then-ordinance and Miami Beach's ordinance. The *Sciarrino* opinions (district and circuit) do not reproduce the ordinance's provisions in detail.[12] This Court must look to what the Eleventh Circuit did write in order to follow the *ratio decidendi* of its decision, and to apply it.

The Court of Appeals in *Sciarrino* described the Key West ordinance as prohibiting "off-premises canvassing," or "OPC," which refers to the practice of "employing 'barkers' to distribute handbills to pedestrians and to engage in face-to-face advertising." *Sciarrino*, 83 F.3d at 366.

> The city ... banned such conduct in specific areas: on public beaches, on Mallory Dock, and in public parking lots. ... Also, OPC activity was significantly restricted, but not banned, on five historic streets heavily trafficked by pedestrians.... In addition, the city established a permitting system for OPC barkers who sought to work on public lands.

*Id.*[13] Furthermore, the Plaintiff in *Sciarrino* owned a pizza restaurant "which is just off one of the busy streets on which OPC activity is now restricted." *Id.*

The *Sciarrino* opinion reveals marked differences between how the Eleventh Circuit read Key West's ordinance and how this Court reads Miami Beach's ordinance. The Eleventh Circuit in *Sciarrino* upheld an ordinance that it viewed as significantly restricting, but not banning, soliciting and handbilling on five historic streets. Miami Beach's ordinance is a total ban on its selected historic streets. Although the plaintiff in *Sciarrino* relied on solicitation activities on Key West's historic streets, his storefront was "just off" one of those streets (where OPC activity was "restricted"). Here, Plaintiffs rely on soliciting on Lincoln Road, and that is also where their storefronts are. Under Miami Beach's ordinance, they cannot stand two feet in front of their businesses to wave someone inside—not even if they do it silently. *See* TR 07/28, at 16:11-17:19 (Melissa Rosa, code compliance officer, testifying that she cited someone for standing two feet in front of a Lincoln Road cosmetics store and "waving to the customers to come inside."). The ordinance upheld in *Sciarrino*, as the Eleventh Circuit understood it, is much less intrusive than the one adopted by the City of Miami Beach.

The Court bears this in mind as it turns to the evidence adduced at the preliminary injunction hearing. Substantial testimony compels the conclusions that (1) less-restrictive alternatives, in the vein of restricting but not banning, are available to the City and are in fact currently used in analogous contexts, and (2) the City failed to show that those less-restrictive alterna-

---

**12.** For this reason the City has submitted to this Court a copy of the Key West ordinance and an amendment to it, which the City represents were both in effect at the time *Sciarrino* was decided. The Court relies on the City's representations that the ordinances it provided are the very same ones upheld by the *Sciarrino* courts, *See* Fed. R. Civ. P. 11. To this Court, it is not clear that they are, for the *Sciarrino* courts' descriptions make much more sense as readings of the Key West ordinance without its amendment than with. The Key West ordinance together with its amendment (just as the City submitted them) is attached to this opinion as Appendix 4.

**13.** This Division of Court in *Sciarrino* described the ordinance similarly. *Sciarrino v. City of Key West*, 867 F.Supp. 1017, 1019 (S.D.Fla.1994) ("The Ordinance does not completely ban OPC activity, but rather limits the location of OPC activity and the number of off-premises canvassers per business.").

tives would not adequately protect its interests.

The City offered the testimony of former Assistant City Manager Jose Jimenez, who "represent[ed] the city administration in its consideration of its amendments to its hand billing and solicitation ordinances." TR 07/27, at 68:18-21. He testified that "things like charitable solicitations" are "allowed but regulated" in the same areas covered by the challenged ordinances. TR 07/27, at 76:15-17. Those activities are regulated with a "permit[,] especially if you're going to set up a table." *Id.* at 76:18-20. Jimenez elaborated on other activities that are allowed but regulated in the City's historic district: "When we have artists or vendors, they're also done by a lottery, and they are spaced appropriately. The volume is regulated. The footprint of the display of the art or the jewelry that they're selling or any music that they might have, that's also heavily regulated." *Id.* at 76:21-25.

These are clear examples of less-restrictive alternatives to a total ban. The City made no attempt to demonstrate why such measures, which it currently applies to "things like charitable solicitations" and "artists or vendors," would not adequately protect its interests if applied to the type of solicitation prohibited by the challenged ordinance. Presumably, a charitable solicitor, who asks pedestrians if they would like to save Lolita the whale, is no less annoying than one of Plaintiffs' greeters, who asks pedestrians if they would like a free demonstration. Presumably, a charitable solicitor (who is evidently permitted to set up a table), an artist, or a vendor, causes no more congestion or aesthetic blight than one of Plaintiffs' greeters. *Cf. Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 72–73, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (rejecting Mt. Ephraim's argu-

ment that it may selectively ban live entertainment from the broad range of commercial uses for reasons normally associated with zoning in commercial districts such as parking, noting that "[w]e do not find it self-evident that a theater, for example, would create greater parking problems than would a restaurant.").

Jimenez offered only brief speculation about the inadequacy of certain less-restrictive alternatives—which the City admittedly did not try. In crafting the challenged ordinance, the City "bounced around several ideas." TR 07/27, at 100:21. One of them was establishing "solicitation boxes," out of which the solicitors could not go while soliciting. *See id.* at 100:17-102:24.[14]

Jimenez offered only weak explanations as to why "solicitation boxes" would not work, including that "we couldn't guarantee people would stay in them." *Id.* at 101:18-19. The court is not convinced. For neither can the City guarantee that solicitors will stay in their stores in the face of the current total ban; and neither can the City guarantee that charitable solicitors will not breach the terms of their permits; and neither can the City guarantee that artists and vendors will not exceed the volume and spacing restrictions imposed on them. Professing an inability to guarantee total compliance with a less-restrictive alternative to a total ban (such as volume or spacing limitations) does not demonstrate the alternative's inadequacy to vindicate the City's interests.

The Court notes that Plaintiffs made an effort to self-regulate in the fashion of "solicitation boxes," by laying down tape in the shape of a box in front of their stores, beyond which their employees were not to pass when soliciting. *See* TR 04/29, at 44:1-

---

14. Others were establishing fictitious "bubbles" surrounding each pedestrian into which solicitors could not intrude, or limiting the ban to aggressive solicitations.

23. However, the record testimony is undeveloped as to whether this specific form of self-regulating adequately advanced the City's interests. In response to a question about "a period of three months ... where the City wasn't enforcing its commercial solicitation ordinances against the plaintiffs," Jimenez testified that the City "had just as many, if not more, complaints during that period." TR 07/27, at 104:6-14. This three-month period refers to an arrangement between Plaintiffs and the City that some witnesses called the "status quo" agreement. Although it is not entirely clear,[15] the Court infers from the record that Plaintiffs operated using their self-imposed boxes during this three-month period, (TR 07/27, at 163:22-23),[16] and that the City still received nine complaints about three of the plaintiffs. TR 07/27, at 132:5-17. But the incomplete testimony about this "status quo," involving some effort by the Plaintiffs (but not other store owners or restaurateurs) at self-regulation, where the City was not even enforcing its ordinances, cannot tell the Court anything meaningful about whether that specific form of a less-restrictive alternative can adequately advance the City's interests.

What was said of Florida in *Fane v. Edenfield* may be said of the City here: It "has the duty to at least explore less intrusive alternatives than a blanket ban" on solicitation. 945 F.2d at 1519. The City failed to do so. *Cf. In re R.M.J.*, 455 U.S. 191, 206, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) ("There is no indication in the record of a failed effort to proceed along such

a less restrictive path."); *Zauderer*, 471 U.S. at 648, 105 S.Ct. 2265 ("nowhere does the State cite any evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertising cannot be combated by any means short of a blanket ban."). Under this ordinance, the defined form of solicitation is prohibited outright. A store owner that stands two feet in front of his own store (or in his doorway, or in his window) and waves to someone outside may reasonably fear a citation. *See* TR 07/28, at 16:11-17:19. Such a total proscription, which substantially ropes in such passive, non-obstructive behavior, cannot be narrowly tailored.

Or if it somehow is, the City has failed to justify it.[17] The City's own practice of "allow[ing] but regulat[ing]" similar activities; the precedent of *Sciarrino*, which upheld an ordinance that made soliciting "significantly restricted, but not banned[;]" and the City's failure to demonstrate why such less-restrictive alternatives would not adequately vindicate its interests, convince this Court that the City's anti-solicitation ordinance is neither "carefully calculated" nor narrowly tailored.

### 3. The Ordinance's Cost to Plaintiffs' First Amendment Interests is too High

The Supreme Court has explained that Plaintiffs' commercial speech, though entitled to less protection than other forms of speech, still has "considerable value":

---

**15.** Guy Weissman's testimony suggests that his decision to "put down a box" may have pre-dated the "status quo" agreement. *See* TR 07/27, at 161:13-21.

**16.** This is not to say that their employees always stayed inside those boxes.

**17.** For a final example of this failure, Jimenez suggested that "regular quiet solicitation was

.... becoming a problem because of how many there were." TR 07/27, at 102:21-24. It appears "obvious" and less-restrictive to the Court that such a problem of volume could be ameliorated with a regulation of volume—as the City does with other solicitors, artists, and vendors—rather than with a more-restrictive total ban. *See Discovery Network*, 507 U.S. at 417 n. 13, 113 S.Ct. 1505.

Unlike many other forms of commercial expression, solicitation allows direct and spontaneous communication between buyer and seller. A seller has a strong financial incentive to educate the market and stimulate demand for his product or service, so solicitation produces more personal interchange between buyer and seller than would occur if only buyers were permitted to initiate contact. Personal interchange enables a potential buyer to meet and evaluate the person offering the product or service and allows both parties to discuss and negotiate the desired form for the transaction or professional relation. Solicitation also enables the seller to direct his proposals toward those consumers who he has a reason to believe would be most interested in what he has to sell. For the buyer, it provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market.

. . . .

The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment. *Edenfield*, 507 U.S. at 766–67, 113 S.Ct. 1792.

Moti Shenfarber, a representative of three of the Plaintiffs, testified that his clientele are the shoppers of Lincoln Road: those pedestrians—mostly tourists—who walk by his stores. TR 04/29, at 38:2-3, 14-15. He testified that he has tried other forms of advertising: he has tried an e-mail campaign, tried to promote on Google and in magazines, worked on a referral program with beauty salons, and talked with bellboys and concierges (presumably to get them to refer patrons to his stores). This was all to no discernable benefit. *Id.* at 38:4-39:12. Guy Weissman, the general manager of Brilliance New York, testified that face-to-face soliciting is the only way to effectively sell his products to his customers—although he testified that the only thing he tried differently (with no success) was e-mailing customers who patronized his store. TR 07/27, at 171:10-172:3.

Plaintiffs' testimony illustrates the "considerable value" of commercial speech, as recognized by the Supreme Court—particularly the value of in-person communication, particularly for them. Sales procured through such solicitations are the lifeblood of their businesses. Plaintiffs demonstrate how the City's blanket ban on solicitations exacts a high cost on their First Amendment interests—for it prohibits them entirely from soliciting where they need it most, and even farther, into the doorposts and windows of their stores. This is why the limited geographical reach of the ordinance incurs it no favor. The oft-repeated principle applies forcefully to Plaintiffs here, that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey, Irvington*, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

The cost is too high. The ordinance is a disfavored blanket ban, and the City has failed to demonstrate the inadequacy of less-restrictive alternatives. The City failed to demonstrate narrow tailoring on multiple fronts which, combined, convince this Court that Plaintiffs have shown a substantial likelihood of success on the merits of their claim that, as applied to their speech, the City's anti-solicitation ordinance violates the First Amendment.

## IV. The Anti-Handbilling Ordinance

Although "the lawfulness of the particular application of the law should ordinarily be decided first," *Fox,* 492 U.S. at 485, 109 S.Ct. 3028, the Court finds it appropriate to proceed directly to Plaintiffs' overbreadth challenge to the anti-handbilling ordinance.[18] That is because, unlike the anti-solicitation ordinance, the overbreadth of the anti-handbilling ordinance is glaring on its face. The prudential concerns that might otherwise dissuade this Court from proceeding directly to an overbreadth challenge—such as the difficulty in determining whether an ordinance's overreach is substantial, the proper functioning of courts, and their efficiency—lose their force in the face of the ordinance's staggering prohibition.

The anti-commercial-handbilling ordinance (Section 46-92) reads, in pertinent part, as follows:

[(a)] (3) *Handbill* means any handbill, flyer, paper, document, dodger, circular, folder, booklet, letter, card, pamphlet, sheet, poster, sticker, banner, notice or other written, printed or painted matter or object that conveys any information, except that "handbill" shall not include a newspaper or its contents.

(4) *Commercial handbill* means any handbill that conveys any information about any good or service provided by a business.

. . . .

(8) *Right of way* means and includes, but is not limited to, any state, county, or city-owned public street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway.

. . . .

(g) *Prohibitions on commercial handbill distribution.*

(1) *Historic Areas.* It shall be unlawful for any person to distribute commercial handbills on the right-of-way in [certain streets and other areas of the City's entertainment district. *See* Appendix 1. The full text of this ordinance and its amendments are attached to this opinion as Appendix 3.]

. . . .

The prohibitions in this subsection (g) shall apply to the distribution of commercial handbills on any right-of-way, including but not limited to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way. All rights-of-way identified as prohibited areas shall include the entire width of the right-of-way, including all sidewalks.

(2) *Sidewalk cafes.* Commercial handbills shall not be distributed on the right-of-way:

a. Within 20 feet in any direction from the outside perimeter of any approved sidewalk cafe (as indicated in the approved site plan attached to the city-issued permit); and

b. On any right-of-way within the approved sidewalk cafe.

(3) *Beaches.* Commercial handbills shall not be distributed on any city beach east of the dunes.

 On its face, the anti-handbilling ordinance prohibits far more than commercial speech. Although the ordinance employs the phrase "commercial handbills," it defines that phrase as "any handbill that conveys any information about any good or service provided by a business." The breadth of the prohibition is staggering. It prohibits expression by handbills to the

---

**18.** *See Dimmitt v. City of Clearwater,* 985 F.2d 1565, 1571 (11th Cir.1993) ("Where the statute governs both commercial and noncommercial speech, however, a litigant with a commercial speech interest may nonetheless qualify by virtue of the overbreadth rule to assert the speech rights of third parties with noncommercial speech interests.").

furthest imaginable extent, where the subject of the expression is "any good or service provided by a business." Even the broadest take on "commercial speech" leaves no doubt that such speech can comprise only a small share of what this ordinance prohibits.

In *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, the Supreme Court confronted a resolution "banning 'all First Amendment activities' at Los Angeles International Airport." 482 U.S. 569, 570, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Inferring from the plain language of the resolution, the Supreme Court concluded that "it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing." *Id.* at 575, 107 S.Ct. 2568. Under the anti-handbilling ordinance, there is similarly no shortage of readily inferred examples. No stretch of the imagination is necessary, and no liberality of construction is required, to see an expansive universe of non-commercial speech prohibited by the ordinance:

- An animal-rights activist stands near McDonalds on Washington Avenue, handing out flyers that read, "Shame on McDonalds! They Don't Use Cage-Free Eggs!"

- Her friend walks around Lummus Park, distributing bumper stickers that read, "Free Lolita! The Seaquarium keeps her in a small tank!"

- A rabbi stands on Ocean Drive, and distributes pamphlets to visiting yeshiva students that inform them which restaurants in the area serve kosher food.

- A food critic, who wants more people to visit her website and to read her blog, distributes laminated placards that list the names, locations, and her review of "Foodie Freddi's Four Favorite Pizza Shops on Lincoln Road."

- Someone stations herself near a cigar store on Española Way, handing out stickers that read, "Smoking tobacco is bad for your health."

Of course, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800, 104 S.Ct. 2118. Furthermore, the Court is "reluctant ... to invalidate legislation 'on the basis of its hypothetical application to situations not before the Court.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 584, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 743, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)). "However, where the [ordinance] unquestionably attaches sanctions to protected conduct, the likelihood that the [ordinance] will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack." *Id.* at 800 n. 19, 104 S.Ct. 2118. In this case, it simply cannot be said that the "arguably impermissible applications of the [ordinance] amount to [no] more than a tiny fraction of the materials within the [ordinance's] reach." *See N.Y. v. Ferber*, 458 U.S. 747, 773, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). While it is not so broad as an ordinance "banning all 'First Amendment activities,'" it nevertheless "reaches the universe of expressive activity" concerning goods or services provided by businesses. *See Bd. of Airport Comm'rs*, 482 U.S. at 570, 574, 107 S.Ct. 2568. The qualification that it does so only where that expressive activity takes the form of handbilling is no mitigation. "One who is rightfully on a street open to the public 'carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word.'" *Taxpayers for Vincent*, 466 U.S. at 809–10, 104 S.Ct. 2118

(quoting *Jamison v. Texas*, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943)).

The Court finds no apparent saving construction of the ordinance—neither an authoritative narrowing construction given by Florida courts, *see Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), nor a narrowing construction permitted by the plain language of the ordinance. *See Houston v. Hill*, 482 U.S. 451, 468, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ("This ordinance is not susceptible to a limiting construction because . . . its language is plain and its meaning unambiguous."). Neither have the parties directed this Court to any source that would permit a saving construction. Given the ordinance's sweep, "it is difficult to imagine that" it "could be limited by anything less than a series of adjudications, and the chilling effect of the [ordinance] on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Bd. of Airport Comm'rs*, 482 U.S. at 575–76, 107 S.Ct. 2568.

The First Amendment forbids the City from silencing its citizenry on the subject of "any good or service provided by a business" where their chosen form of expression is the distribution of a "handbill"—which under the ordinance means any conceivable form of paper (and more) except newspaper (which the ordinance does not define[19]). The fact that the ordinance extends to a limited geographical area does not save it from its overreaching within that area—the quintessential public forum.[20]

The overbreadth of the anti-handbilling ordinance, which prohibits handbilling on the basis of a handbill's content,[21] is substantial. Plaintiffs have shown a substantial likelihood of success on the merits of their claim that the ordinance is unconstitutional on its face.

## V. Plaintiffs Have Shown Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (affirming the conclusion that the district court abused its discretion in denying preliminary injunctive relief, where the loss of First Amendment freedoms "was both threatened and occurring at the time of respondents' motion [for preliminary injunction] and since respondents sufficiently demonstrated a probability of success on

19. Although the Court does not rule on vagueness grounds, it notes that the ordinance does have vagueness problems. *Cf. Bd. of Airport Comm'rs*, 482 U.S. at 576, 107 S.Ct. 2568 (although not expressly ruling on vagueness grounds, noting that "the vagueness of [a] suggested [limiting] construction itself presents serious constitutional difficulty."). For example, Jimenez testified that the *Miami New Times* published an article favoring the City's position in this litigation. *See* DE 35-13. Is the *Miami New Times* a "newspaper"? Under the ordinance, it is anyone's (including any enforcement officer's) guess. If it were a close question, as between the *Miami New Times* and a similar publication that published an article lambasting the City's position in this litigation, might a City enforcement officer determine that one is a "newspaper" and

the other is not? "Such an ordinance that confers on enforcement officers " 'a virtually unrestrained power' " to charge persons with a violation may be unconstitutional "because '[t]he opportunity for abuse . . . is self-evident.' " *Id.* at 576, 107 S.Ct. 2568 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135–36, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (Powell, J., concurring)).

20. The prohibition on handbilling also extends into private property interests, just like the anti-solicitation ordinance.

21. *Cf. Reed v. Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional").

the merits"). As the Eleventh Circuit has held,

> [t]he only area of constitutional jurisprudence where we have said that an ongoing violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence. The rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by money damages; in other words, plaintiffs could not be made whole.

██ *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir.2006) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (alteration in original). Plaintiffs here have demonstrated that the ordinances chill their First Amendment interests, which shows an irreparable injury.

Before turning to the third and fourth prongs of the preliminary injunction standard, the Court observes that its holding with respect to the anti-solicitation ordinance is an as-applied holding. Of course, as-applied does not necessarily, as a practical matter, mean as-applied; for the Supreme Court has recognized that an as-applied holding's rationale "may be so broad as to render the [ordinance] effectively unenforceable." *Fox*, 492 U.S. at 485, 109 S.Ct. 3028. But this Court cannot resolve that post-hoc interpretive problem, or account for what the City's enforcement calculations might be after the ink has dried. In reaching this decision concerning the anti-solicitation ordinance, the Court focuses on the case before it, and tailors its decision to address the ordinance as applied to Plaintiffs' speech.

## VI. The Threatened Injury to Plaintiffs Outweigh Whatever Damage the Proposed Injunction May Cause the City

██ Elsewhere in this opinion, the Court has accepted both the importance of Plaintiffs' First Amendment interests and the legitimacy and substantiality of the City's asserted interests in the ordinances. However, Plaintiffs have demonstrated that the threatened injury they face outweighs whatever damage the proposed injunction may cause the City. For all of the City's alarm at the rising tide of solicitation and handbilling activities in its historic district, time and again during the preliminary injunction hearing its officials (and other witnesses) acknowledged that visitation, property values, and other metrics of economic well-being in the historic district have only improved in tandem with those activities. *See* TR 07/27, at 139:17-140:7 (visitors, sales revenue, cost of rent, and taxes are all up in Miami Beach at the same time as the soliciting and handbilling problems); *id.* at 71:12 ("we're riding a good wave now"); *id.* at 71:17-23 (describing a more-than-ten-fold rise in rent per square foot since the 1990s and remarking, "Now we are at a boom"); *id.* at 96:17-21 (testifying that the City "outgrew" its old handbilling regulation because the City went from "identifiable high impact week-end[s] and then some relatively calm ones to mostly high impact weekends and then ones that were even busier than that.").

While the City did show that it has directed personnel and financial resources away from other City districts to the historic district to deal with the solicitation problem, it offered very little elaboration. *See* TR 07/28, at 38:20-39:3. On this record, the Court cannot consider it to be a significant harm.

The City has at most been able to show harm to its aesthetic interests in keeping its walking public free from annoyance. The Court does not discount this interest, but damage to the Plaintiffs' interest in "that great Amendment"[22] outweighs dam-

---

22. *Schad*, 452 U.S. at 88, 101 S.Ct. 2176 (Burger, C.J., dissenting).

age to the City's asserted interest in aesthetics.[23]

## VII. If Issued, the Injunction Will not Be Adverse to the Public Interest

■ Finally, the Court concludes that the proposed injunction will not be adverse to the public interest. Rather, in the Court's view, to preliminarily enjoin the challenged ordinances is to vindicate the public interest in "the freedom of speech." U.S. Const. amend. I.[24]

## VIII. Conclusion

Therefore, it is **ORDERED, ADJUDGED, and DECREED**:

23. The Court declines to set a bond. The City has not demanded one and, as detailed in this Part, the City has not shown that it will suffer any appreciable monetary harm should the Court enjoin enforcement of the ordinances. *See AFC Enters., Inc. v. THG Restaurant Grp., LLC*, 416 Fed.Appx. 898, 898 (11th Cir.2011) ("it is within the discretion of the court to set the amount of the bond or to require 'no security at all.'") (quoting *BellSouth Tele-*

1. Plaintiffs' Renewed Motion for Preliminary Injunction (**DE 27**) be, and the same is, hereby **GRANTED**.

2. The City of Miami Beach is preliminarily **ENJOINED** from enforcing Section 74-1 of its Code of Ordinances against Plaintiffs.

3. The City of Miami Beach is preliminarily **ENJOINED** from enforcing Section 46-92 of its Code of Ordinances.

## DONE and ORDERED

### Appendix 1

### Proposed Commercial Solicitation/Handbill Prohibition Area

*comms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir.2005)).

24. Because the Court rules on First-Amendment grounds, there is no need to address Plaintiffs' equal protection argument at this time.

## Appendix 2

### ARTICLE I. IN GENERAL

Sec. 74-1. Soliciting business in public from pedestrians.

Secs. 74-2-74-35. Reserved.

### Sec. 74-1. Soliciting business in public from pedestrians.

(a)

*Prohibitions.* It shall be unlawful for any person, while upon any public street or sidewalk or while in any building, doorway, stairway, window or other opening abutting on or adjacent to such street or sidewalk, to accost or attempt to accost any pedestrian on such street or sidewalk for the purpose of soliciting him to purchase any property, real or personal, or any food, beverage or service, or to solicit him to enter any place of business for the purpose of selling to or inducing or attempting to induce such pedestrian to purchase any property, real or personal, or any food, beverage or service.

(b)

*Enforcement; penalties; appeals; unpaid fines to constitute liens.* Enforcement of this section shall be in accordance with the following procedures:

(1)

If a code compliance officer finds a violation of this chapter, the compliance officer shall issue a notice of violation to the violator as provided in chapter 30. The notice shall inform the violator of the nature of the violation, amount of fine for which the violator may be liable, instructions and due date for paying the fine, notice that the violation may be appealed by requesting an administrative hearing within 20 days after service of the notice of violation, and that failure to do so shall constitute an admission of the violation and waiver of the right to a hearing.

(2)

A violator who has been served with a notice of violation shall elect either to:

a.

Pay the civil fine as follows:

(i)

First offense: $50.00;

(ii)

Second offense: $100.00;

(iii)

Third and subsequent offenses: $250.00; or

b.

Request an administrative hearing within 20 days before a special master appointed as provided in article II of chapter 30 to appeal the decision of the code compliance officer which resulted in the issuance of the notice of violation;

c.

The special master shall not have discretion to alter the penalties prescribed in subsection (b)(2)a.

(3)

If the named violator, after notice, fails to pay the civil fine or fails to timely request an administrative hearing before a special master, the special master shall be informed of such failure by report from the code compliance officer. Failure of the named violator to appeal the decision of the code compliance officer within the prescribed time period shall constitute a waiver of the violator's right to administrative hearing before the special master. A waiver of the right to an adminis-

trative hearing shall be treated as an admission of the violation. and penalties may be assessed accordingly.

(4) .

Any party aggrieved by the decision of the special master may appeal the decision in accordance with law.

(5)

The city may institute proceedings in a court of competent jurisdiction to compel payment of civil fines.

(6) ·

A certified copy of an order imposing a civil fine may be recorded in the public records and thereafter shall constitute a lien upon any other real or personal property owned by the violator and it may be enforced in the same manner as a court judgment by the sheriffs of this state, including levy against the personal property, but shall not be deemed to be a court judgment except for enforcement purposes. After two· months from the filing of any such lien which remains unpaid, the city may foreclose or otherwise execute upon the lien.

(c)

*[Procedures for appeals.]* The procedures for appeal of the notice of violation by administrative hearing shall be as set forth in sections 102-384 and 102-385 ·

(Code 1964, § 25-86.1; Ord. No. 2012-3756, § 2, 4-11-12)

## Secs. 74-2—74-35. Reserved.

### ORDINANCE NO. _____

AN ORDINANCE OF THE MAYOR AND CITY ·COMMISSION OF THE CITY OF MIAMI BEACH, FLORIDA, AMENDING CHAPTER 74 OF THE CODE OF THE CITY OF MIAMI BEACH, FLORIDA, ENTITLED "PEDDLERS AND SOLICITORS," BY AMENDING· ARTICLE I, ENTITLED "IN GENERAL," BY AMENDING SECTION 74.1, ENTITLED "SOLICITING BUSINESS IN PUBLIC FROM PEDESTRIANS," TO PROHIBIT COMMERCIAL SOLICITATION IN. CERTAIN AREAS; PROVIDING FOR REPEALER, SEVERABILITY, CODIFICATION, AND AN EFFECTIVE DATE. ·

WHEREAS, Washington· Avenue from 5th Street to Lincoln Road ("Washington Avenue"); Ocean Drive from 5th Street to 15th Street ("Ocean Drive"); the area bounded on the north by, but not including, 17th Street, bounded on the east by, but not including, Washington Avenue, bounded on the south by Lincoln Lane, and bounded on the west by Alton Road ("Lincoln .Road Area"); the area bounded on the north by 15th Street, bounded on the east. by. Ocean Drive, bounded on the south by 5th Street, and bounded on the west by Washington Avenue ("Collins Avenue Area"); Española Way from Pennsylvania Avenue to Collins Avenue. ("Española Way"); and Lummus Park, are located within or adjacent to unique historic districts in the City of Miami Beach ("City") and are nationally and internationally popular tourist destinations; and

WHEREAS, the ·City of Miami Beach and, in particular, the Lincoln Road Area, Española Way, Lummus Park, Ocean Drive, Washington Avenue, and the Collins Avenue Area, are located in the· "South Beach" area, which attracts a reported 6.8 million tourists from around the world annually and .is host to a myriad of major events, such as Art Basel—Miami Beach, The Food Network South Beach Wine & Food Festival, the Miami International Boat Show, White· Party, .Winter Party,

Winter Music Conference, Miami Marathon, Art Deco Weekend, South Beach Comedy Festival, Mercedes Benz Swimwear Fashion Week, among others, that attract local, national, and international visitors; and

WHEREAS, situated within the Lincoln Ocean Drive, Washington Avenue, Lummus Park, and Collins Avenue Areas, and along Española Way are a multitude of retail, Road and dining, and entertainment venues that include restaurants, sidewalk cafes, nightclubs, the Fillmore at the Jackie Gleason Theater, the New World Symphony, City parks, and retail stores, all of which are heavily trafficked by residents, visitors, and tourists who desire to visit, shop, dine, and attend cultural performances, or to simply stroll along these areas without any disruption and intimidation; and

WHEREAS, the City of Miami Beach has a significant governmental interest in providing its residents, visitors, and tourists with a pleasant, enjoyable, and safe environment free of nuisance activity; and

WHEREAS, the commercial solicitation of pedestrians along these heavily traveled pedestrian areas causes increased pedestrian congestion and harassment of tourists and residents who traverse these historic areas; and

WHEREAS, the harassment of pedestrians arising from commercial solicitation activities is a burgeoning problem in the City of Miami Beach, as reflected by numerous complaints from residents, business owners, and visitors; and

WHEREAS, the businesses that engage in commercial solicitation activities disrupt the activities of the surrounding outdoor cafes, restaurants, nightclubs, retail establishments, and entertainment venues, by physically approaching, harassing, and intimidating residents, visitors and tourists in places where it is difficult to exercise the right to decline to listen to them or avoid their requests; and

WHEREAS, commercial solicitation activities on the public rights-of-way in the above stated areas dissuade residents, visitors and tourists from traversing these areas, resulting in the disruption and/or loss of business to the surrounding outdoor cafes, restaurants, nightclubs, retail establishments, and entertainment venues; and

WHEREAS, the businesses that engage in solicitation activities regularly distribute commercial handbills to pedestrians, resulting in increased litter and adversely impacting the City's interests in preserving its aesthetic ambience, tourist industry, and image as a beautiful and enjoyable beachfront destination; and

WHEREAS, the City recognizes that commercial speech is entitled to First Amendment protection and its regulation must be content-neutral and narrowly tailored to serve a significant government interests while leaving open alternative channels of communication; and

WHEREAS, the City has significant governmental interests in protecting the character of its historic districts, developing the high-end retail and high-end promenades within its historic and entertainment districts, promoting luxury tourism, minimizing the harassment of pedestrians along the public right-of-way, minimizing congestion, reducing litter, and improving the aesthetic experience for residents and visitors; and

WHEREAS, it would serve the aforementioned governmental interests for the Commission to enact an Ordinance increasing the City's ability to enforce its regulations by prohibiting the commercial solicitation of pedestrians on the public rights-of-way on Washington Avenue, Ocean Drive, the Collins Avenue Area, the Lin-

coln Road Area, Española Way, and Lummus Park;

NOW, THEREFORE, BE IT DULY ORDAINED BY THE MAYOR AND CITY COMMISSION OF THE CITY OF MIAMI BEACH AS FOLLOWS:

SECTION 1. That Article I of Chapter 74 of the Code of the City of Miami Beach, Florida is hereby amended as follows:

## Chapter 74
## PEDDLERS AND SOLICITORS

\* \* \*

### ARTICLE I. IN GENERAL

\* \* \*

**Sec. 74-1. Soliciting business in public ~~from pedestrians.~~**

(a) *Prohibitions.* It shall be unlawful ~~for any person, while upon any public street or sidewalk or while in any building, doorway, stairway, window or other opening abutting on or adjacent to such street or sidewalk,~~ to solicit ~~accost or attempt to accost~~ any ~~pedestrian~~ person ~~on such street or sidewalk~~ for the purpose of ~~soliciting~~ inducing ~~him~~ such person to purchase any property, real or personal, or any food, beverage or service, or to solicit ~~him~~ such person to enter any place of business for the purpose of ~~selling to or~~ inducing or attempting to induce such ~~pedestrian~~ person to purchase any property, real or personal, or any food, beverage or service.

This Section shall apply when the solicitor or the person being solicited is located on any public right-of-way, which means and includes, but is not limited to, any street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway, in any of the following areas in the City of Miami Beach. This Section shall also apply to any doorway, stairway, window or other opening of a building abutting on or adjacent to

such right-of-way, in any of the following areas in the City of Miami Beach:

(1) The area bounded on the north by, but not including, 17th Street, bounded on the east by, but not including, Washington Avenue, bounded on the south by Lincoln Lane, and bounded on the west by Alton Road;

(2) Ocean Drive from 5th to 15th Streets;

(3) Collins Avenue from 5th to 15th Streets;

(4) Washington Avenue from 5th to Lincoln Road;

(5) All cross streets and bystreets bounded on the north by 15th Street, bounded on the east by Ocean Drive, bounded on the south by 5th Street, and bounded on the west by Washington Ave;

(6) Española Way from Pennsylvania Avenue to Collins Avenue; and

(7) Lummus Park

\* \* \*

## SECTION 2. CODIFICATION

It is the intention of the Mayor and the City Commission of the City of Miami Beach, and it is hereby ordained that the provisions of this Ordinance shall become and be made apart of the Code of the City of Miami Beach, Florida. The sections of this ordinance may be renumbered or relettered to accomplish such intention, and the word "ordinance" may be changed to "section," "article," or other appropriate word.

## SECTION 3. REPEALER

All ordinances or parts of ordinances in conflict herewith be and the same are hereby repealed.

## SECTION 4. SEVERABILITY

If any section, subsection, clause or provision of this Ordinance is held invalid, the remainder shall not be affected by such invalidity.

_____
Rafael E. Granado, City Clerk

Underscore denotes additions
~~Strike-through~~ denotes deletions

(Sponsored by Mayor Philip Levine)

## SECTION 5. EFFECTIVE DATE

**PASSED** and **ADOPTED** this ___ day of _____, 2014.

This Ordinance shall take effect on the ___ day of _____, 2014.

**ATTEST:**

_____
Philip Levine, Mayor

APPROVED AS TO
FORM & LANGUAGE
& FOR EXECUTION

City Attorney _CM_ 9/23/14 Date

### Appendix 3

**Sec. 46-92. Litter; definitions; prohibitions on litter; penalties for litter and commercial handbill violations; commercial handbill regulations, fines, and rebuttable presumptions; seizure and removal of litter by the city; enforcement; appeals; liens.**

(a)

_Definitions._ The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

(1)

_Benefactor_ means the owner of the business advertised in the commercial handbill whose agent, employee, contractor, promoter, or other representative did or caused the throwing, discarding, placing or depositing.

(2)

_Business_ means any commercial or industrial activity, entity, or event in or for which any goods or services are made, sold or offered for sale or other consideration, pecuniary or otherwise.

(3)

_Handbill_ means any handbill, flyer, paper, document, dodger, circular, folder, booklet, letter, card, pamphlet, sheet, poster, sticker, banner, notice or other written, printed or painted matter or object that conveys any information, except that "handbill" shall not include a newspaper or its contents.

(4)

_Commercial handbill_ means any handbill that conveys any information about any good or service provided by a business.

(5)

_Litter_ means any paper, handbill, commercial handbill, garbage, bottle caps, chewing gum, tobacco prod-

ucts, including, but not limited to, used and unused cigarettes, cigars, pipe or chewing tobacco, styrofoam or plastic products, or other waste, including, but not limited to, tree, plant, and grass cuttings, leaves, or other yard maintenance debris, that has been placed or deposited on a public sidewalk, street, road, avenue, beach, swale, median, building, fence, wall, boardwalk, beachwalk, baywalk, cutwalk, park, or in a gutter, drain, or sewer, or on any other public property, right-of-way or place, or on any object located on public property, or on the kneewall, window ledge or sill of any public or private building, or on a motor vehicle, or on any other type of private real or personal property. Handbills and commercial handbills attached to a trash receptacle, but not within the trash receptacle in the usual manner, shall also be considered litter.

(6)

*One day* means a 24-hour period from noon to noon.

(7)

*Person, benefactor, or owner* include, within their respective meanings, either an individual or an entity.

(b)

*Litter prohibited.* It shall be unlawful for any person or benefactor to throw, discard, place or deposit, or cause to be thrown, discarded, placed, or deposited, litter in any manner or amount whatsoever in or on any public highway, sidewalk, road, street, alley, thoroughfare, beach, park, baywalk, beachwalk, cutwalk, sidewalk cafe areas, or any other public place, except in containers or areas lawfully provided therefor. It shall be unlawful

for any person to throw, discard, place or deposit any garbage, cans, bottles or containers in or on any freshwater lakes, rivers, streams, canals, or tidal or coastal waters within the city. In addition, it shall be unlawful for any person to throw, discard, place or deposit litter in any manner or amount whatsoever on any private real or personal property, including, but not limited to, sidewalk cafe furniture and fixtures, unless prior consent of the owner has been given and unless such litter will not cause a public nuisance or be in violation of any other state or local laws, rules or regulations.

(c)

*Prohibitions on beaches.* It shall be unlawful for any person to carry onto any beach within the city a glass or metal bottle or other glass or metal container. In addition, it shall be unlawful for any person to carry any styrofoam product onto any beach within the city or for any business to provide plastic straws with the service or delivery of any beverage to patrons on the beach.

(d)

*Prohibitions on causing litter in sewers and on public and private property.* It shall be unlawful for any person to use leaf blowers, or any other means, to sweep, cast or throw, or cause to be cast or thrown, or discarded into any of the gutters, drains, sewers, or public rights-of-way within the city, or upon any adjacent public or private real or personal property, any garbage, litter, paper, handbill, trash, tree, plant, or grass cuttings, leaves, yard maintenance debris, or other objects or substances.

(e)

*Garbage container requirements for restaurants.* All restaurants with

take-out service shall have up to four garbage containers, as need requires, based on the determination of the city manager or his designee. The containers shall be located in front of and within 50 feet in each direction of the premises at locations approved by the city manager or his designee. These containers shall be kept in clean and sanitary condition at all times and shall be emptied daily or more frequently if necessary to prevent overflowing. The garbage containers required by this section are in addition to those required by chapter 90 of this Code.

(f)

*Penalties for violations.* The following civil fines shall be imposed for violations of this section except as provided in subsection (h) below:

(1)

First offense: $50.00 fine.

(2)

Second offense: $100.00 fine.

(3)

Third or subsequent offense: $500.00 fine.

In lieu of a fine, the special master may accept voluntary community service removing litter in the city equivalent to one hour of community service for each $5.00 of an imposed fine. If the community service is not completed within six months of an adjudication of guilt, the fine shall be reinstated.

(g)

*Prohibitions on commercial handbill distribution.*

(1)

*Definitions.* The following words, terms and phrases, when used in this section, shall have the meanings ascribed to them in this subsection, except where the context clearly indicates a different meaning:

a.

*Art deco historic district* means that area within the boundaries of the National Register Historic District (the Miami Beach Architectural District) as set forth in appendix A.

b.

*High impact periods* mean those periods of time as annually designated by the city manager during which one or more of the following occur:

(i)

There is a designated major event period;

(ii)

A maintenance of traffic plan is required (e.g., including, but not limited to, street closures, lane closures, shuttle service);

(iii)

Hotel occupancy levels are anticipated to be greater than 75 percent;

(iv)

Mutual aid or other assistance from outside agencies is required to provide for the safety and well-being of residents and visitors to the destination; and

(v)

An event on public property is anticipated to result in more than 25,000 visitors to the destination.

c.

*Right-of-way* means and includes, but is not limited to, any state, county, or city owned public street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway.

(2)

*Art deco historic district during high impact periods.* Commercial handbills shall not be distributed in the art deco historic district during high impact periods on Ocean Drive from 6th through 15th Streets, Washington Avenue from 6th through 17th Streets, Collins Avenue from 6th through 17th Streets, and on any portion of Lincoln Road.

(3)

*Sidewalk cafes.* Commercial handbills shall not be distributed on the right-of-way:

a.

Within 20 feet in any direction from the outside perimeter of any approved sidewalk cafe (as indicated in the approved site plan attached to the city-issued permit); and

b.

On any right-of-way within the approved sidewalk cafe.

(4)

*Beaches.* Commercial handbills shall not be distributed on any city beach east of the dunes.

(h)

*Penalties for commercial handbill violations.* If a violation resulted from the throwing, discarding, placing, or depositing, or causing to be thrown, discarded, placed, or deposited, of commercial handbills as litter in violation of subsection (b), or resulted from a violation of subsection (g), then the following civil fines shall be imposed. The special master shall not have discretion to alter these prescribed penalties except as to the per handbill fine of $50.00 provided in subsection (f)(1).

(1)

If the offense is the first offense, $100.00 fine, plus $50.00 per handbill for a violation of subsection (b);

(2)

If the offense is the second offense within the preceding 12 months, $500.00 fine, plus $50.00 per handbill for a violation of subsection (b);

(3)

If the offense is the third or subsequent offense within the preceding 12 months, $1,500.00 fine, plus $50.00 per handbill for a violation of subsection (b);

(4)

Notwithstanding subsections (h)(1)—(3), no person or benefactor shall receive more than one offense within any one-day period; however, the $50.00 per handbill fine shall apply to all littered handbills found during that one-day period for a violation of subsection (b).

(i)

*Commercial handbill presumption.* At any prosecution for violation of this section when the litter involved is a commercial handbill, if ten or more commercial handbills advertising the same business are found in plain view as litter under circumstances that make it more likely than not that the commercial handbills were placed there, or caused to be placed there, by an agent, employee, contractor, promoter, or other representative of the business advertised on the face of the commercial handbills, the special master shall apply a rebuttable presumption that the business advertised on the face of the handbills threw, discarded, placed or deposited the commercial handbills as litter.

(j)

*Securing of commercial handbill litter by the city.* If a person is found littering with commercial handbills, the code compliance officer is authorized to seize, for use as evidence in the prosecution of the violator before the special master, all commercial handbills in the possession of the violator.

(k)

*Removal of litter by the city.* The city may cause the removal, at the violator's expense, of all litter distributed or placed in violation of this section.

(*l*)

*Enforcement by code compliance officers; notice of violation.* If a code compliance officer finds a violation of this article, such code compliance officer shall issue a notice of violation to the violator as provided in chapter 30. The notice shall inform the violator of the nature of the violation, amount of fine for which the violator may be liable, instructions and due date for paying the fine, notice that the violation may be appealed by requesting an administrative hearing within 20 days after service of the notice of violation, and that failure to do so shall constitute an admission of the violations and waiver of the right to a hearing.

(m)

*Rights of violators; payment of fine; right to appeal; failure to pay civil fine or to appeal.*

(1)

A violator who has been served with a notice of violation shall elect either to:

a.

Pay the civil fine in the manner indicated on the notice; or

b.

Request an administrative hearing before a special master appointed by the city commission upon recommendation of the city manager to appeal the decision of the code compliance officer which resulted in the issuance of the notice of violation.

(2)

The procedures for appeal by administrative hearing of the notice of violation shall be as set forth in sections 102-384 and 102-385 of the City Code.

(3)

If the named violator after notice fails to pay the civil fine or fails to timely request an administrative hearing before a special master, the special master shall be informed of such failure by report from the code compliance officer. Failure of the named violator to appeal the decision of the code compliance officer within the prescribed time period shall constitute a waiver of the violator's right to administrative hearing before the special master. A waiver of the right to an administrative hearing shall be treated as an admission of the violation and penalties may be assessed accordingly.

(4)

Any party aggrieved by the decision of the special master may appeal the decision in accordance with law.

(n)

*Recovery of unpaid fines; unpaid fines to constitute a lien; foreclosure.*

(1)

The city may institute proceedings in a court of competent jurisdiction to compel payment of civil fines.

(2)

A certified copy of an order imposing a civil fine may be recorded in the public records and thereafter shall constitute a lien upon any other real or personal property owned by the violator. and it may be enforced in the same manner as a court judgment by the sheriffs of this state, including levy against the personal property, but shall not be deemed to be a court judgment except for enforcement purposes. After two months from the filing of any such lien which remains unpaid, the city may foreclose or otherwise execute upon the lien.

(o)
 *Planning board authority.* Nothing in this article shall limit or restrict any condition or limitation imposed by the planning board.

(p)
 *Injunctive relief.* As an additional means of enforcement, the city may seek injunctive relief and/or follow procedures to revoke a business tax receipt and/or certificate of use as set forth in chapters 14, 18 and 102 of the City Code when there are more than three offenses by the same violator within a calendar year.

(Code 1964, § 3-7; Ord. No. 94-2913, § 1(3-7), 3-16-94; Ord. No. 2007-3560, § 1, 6-6-07; Ord. No. 2009-3644, § 1, 7-15-09; Ord. No. 2010-3708, § 1, 11-17-10; Ord. No. 2012-3759, § 1, 4-11-12)

Cross reference—*Public property, ch. 82; beaches generally, § 82-436 et seq.*

### ORDINANCE NO. _____

AN ORDINANCE OF THE MAYOR AND CITY COMMISSION OF THE CITY OF MIAMI BEACH, FLORIDA, AMENDING CHAPTER 46 OF THE CODE OF THE CITY OF MIAMI BEACH, FLORIDA, ENTITLED "ENVIRONMENT," BY AMENDING ARTICLE III, ENTITLED "LITTER," BY AMENDING DIVISION 1, ENTITLED "GENERALLY," BY AMENDING SECTION 46-92(a), ENTITLED "DEFINITIONS," BY ADDING A DEFINITION FOR THE TERM "RIGHT-OF-WAY," BY AMENDING SECTION 46-92(9), ENTITLED "PROHIBITION ON COMMERCIAL HANDBILL DISTRIBUTION," BY AMENDING THE REGULATIONS AND PROHIBITIONS FOR THE DISTRIBUTION OF COMMERCIAL HANDBILLS; PROVIDING FOR REPEALER, SEVERABILITY, CODIFICATION, AND AN EFFECTIVE DATE.

WHEREAS, Washington Avenue from 5th Street to Lincoln Road ("Washington Avenue"); Ocean Drive from 5th Street to 15th Street ("Ocean Drive"); the area bounded on the north by, but not including, 17th Street, bounded on the east by, but not including, Washington Avenue, bounded on the south by Lincoln Lane, and bounded on the west by Alton Road ("Lincoln Road Area"); the area bounded on the north by 15th Street, bounded on the east by Ocean Drive, bounded on the south by 5th Street, and bounded on the west by Washington Avenue ("Collins Avenue Area"); Española Way from Pennsylvania Avenue to Collins Avenue ("Española Way"); and Lummus Park, are located within or adjacent to unique historic districts in the City of Miami Beach ("City") and are nationally and internationally popular tourist destinations; and

WHEREAS, the City of Miami Beach and, in particular, the Lincoln Road Area, Espafiola Way, Lummus Park, Ocean Drive, Washington Avenue, and the Collins Avenue Area, are located in the "South

Beach" area, which attracts a reported 6.8 million tourists from around the world annually and is host to a myriad of major events, such as Art Basel-Miami Beach, The Food Network South Beach Wine & Food Festival, the Miami International Boat Show, White Party, Winter Party, Winter Music Conference, Miami Marathon, Art Deco Weekend, South Beach Comedy Festival, Mercedes Benz Swimwear Fashion Week, among others, that attract local, national, and international visitors; and

WHEREAS, situated within the Lincoln Road and Collins Avenue Areas, and along Ocean Drive, Washington Avenue, Lummus Park, and Española Way are a multitude of retail, dining, and entertainment venues that include restaurants, sidewalk cafes, nightclubs, the Miami Beach Convention Center, the Fillmore at the Jackie Gleason Theater, the New World Symphony, City parks, and retail stores, all of which are heavily trafficked by residents, visitors, and tourists who desire to visit, shop, dine, and attend cultural performances, or to simply stroll along these areas without any disruption and intimidation; and

WHEREAS, the distribution of commercial handbills on these heavily traveled pedestrian areas causes increased pedestrian congestion, harassment of the tourists and residents who traverse these historic areas, and increases litter on sidewalks, streets, and in sidewalk café areas; and

WHEREAS, the litter on public property caused by persons distributing commercial handbills' has been a problem in the City of Miami Beach for many years and has been the subject of City Commission discussions; and

WHEREAS, the harassing and excessive commercial handbill distribution in or on Washington Avenue, Ocean Drive, the Collins Avenue Area, the Lincoln Road Area, Española Way, and Lummus Park has resulted in significant complaints to the City, and to local business owners, from residents and tourists who seek a pleasant strolling and sightseeing experience and is an invasion of the privacy of pedestrians and a detrimental nuisance which adversely impacts the City's tourist industry; and

WHEREAS, the harassing and excessive commercial handbill distribution on the public rights-of-way that are adjacent to and within sidewalk cafe areas is also a detrimental nuisance which invades the privacy of cafe diners and adversely impacts the City's interests in preserving its aesthetic ambience, tourist industry, and image as a beautiful and enjoyable beachfront destination; and

WHEREAS, the businesses that engage in commercial solicitation activities through the distribution of handbills disrupt the activities of the surrounding outdoor cafes, restaurants, nightclubs, retail establishments, and entertainment venues, by physically approaching, harassing, and intimidating residents, visitors, and tourists in places where it is difficult to exercise the right to decline to listen to them or avoid their requests; and

WHEREAS, the commercial solicitation activities engaged in by some businesses dissuade residents, visitors, and tourists from traversing the aforementioned areas, resulting in a disruption of business to the surrounding outdoor cafes, restaurants, nightclubs, retail establishments, and entertainment venues; and

WHEREAS, the City recognizes that commercial speech, including speech disseminated through commercial handbills, is entitled to First Amendment protection and its regulation must be content-neutral and narrowly tailored to serve significant

government interests while leaving open alternative channels of communication; and

WHEREAS, the City has significant governmental interests in protecting the character of its historic districts, developing high-end retail and high-end promenades within its historic and entertainment districts, promoting luxury tourism, minimizing the harassment of pedestrians along the public right-of-way, minimizing congestion, reducing litter, and improving the aesthetic experience for residents and visitors; and

WHEREAS, it would serve the aforementioned governmental interests for the City Commission to enact an Ordinance increasing the City's ability to enforce its litter regulations by prohibiting the distribution of commercial handbills in and along Washington Avenue, Ocean Drive, the Collins Avenue Area, the Lincoln Road Area, Española Way, and Lummus Park.

NOW, THEREFORE, BE IT DULY ORDAINED BY THE MAYOR AND CITY COMMISSION OF THE CITY OF MIAMI BEACH AS FOLLOWS:

SECTION 1. That Division 1 of Article III of Chapter 46 of the Code of the City of Miami Beach, Florida is hereby amended as follows:

## Chapter 46
## ENVIRONMENT

* * *

## ARTICLE III. LITTER

* * *

## DIVISION 1. GENERALLY

**Sec. 46-92. Litter; definitions; prohibitions on litter; penalties for litter and commercial handbill violations; commercial handbill regulations, fines, and rebuttable presumptions; seizure and re-** moval of litter by the city; enforcement appeals; liens.

(a) *Definitions.* The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

* * *

(3) *Handbill* means any handbill, flyer, paper, document, dodger, circular, folder, booklet, letter, card, pamphlet, sheet, poster, sticker, banner, notice or other written, printed or painted matter or object that conveys any information, except that "handbill" shall not include a newspaper or its contents.

(4) *Commercial handbill* means any handbill that conveys any information about any good or service provided by a business.

* * *

(8) *Right-of-way* means and includes, but is not limited to, any state, county, or city-owned public street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway.

* * *

(g) *Prohibitions on commercial handbill distribution.*

(1) *Historic Areas.* It shall be unlawful for any person to distribute commercial handbills on the right-of-way in any of the following areas in the City of Miami Beach:

a. The area bounded on the north by, but not including, 17th Street, bounded on the east by, but not including, Washington Avenue, bounded on the south by Lincoln Lane, and bounded on the west by Alton Road;

b. Ocean Drive from 5th to 15th Streets;

c. Collins Avenue from 5th to 15th Streets;

d. Washington Avenue from 5th to Lincoln Road;

e. All cross streets and bystreets bounded on the north by 15th Street, bounded on the east by Ocean Drive, bounded on the south by 5th Street, and bounded on the west by Washington Ave;

f. Española Way from Pennsylvania Avenue to Collins Avenue; and

g. Lummus Park.

The prohibitions in this subsection (g) shall apply to the distribution of commercial handbills on any right-of-way, including but not limited to any doorway, stairway, window or other opening of a building abutting on or adjacent to such right-of-way. All rights-of-way identified as prohibited areas shall include the entire width of the right-of-way, including all sidewalks.

(1) *Definitions.* The following words, terms and phrases, when used in this section, shall have the meanings ascribed to them in this subsection, except where the context clearly indicates a different meaning:

a. *Art deco historic district* means that area within the boundaries of the National Register Historic District (the Miami Beach Architectural District) as set forth in appendix A.

b. *High impact periods* mean those periods of time as annually designated by the city manager during which one or more of the following occur:

(i) There is a designated major event period;

(ii) A maintenance of traffic plan is (e.g., including, but limited to, street closures, shuttle service);

(iii) Hotel occupancy levels are anticipated to be greater than 75 percent;

(iv) Mutual aid or other assistance from outside agencies is required to provide for the safety and well-being of residents and visitors to the destination and

(v) An event on public property is anticipated to result in more than 25,000 visitors to the destination.

c. *Right-of-way* means and includes, but is not limited to, any state, county, or city owned public street, sidewalk, street corner, curb, bicycle path, or pedestrian walkway.

(2) *Art deco historic district during high impact periods.* Commercial handbills shall not be distributed in the art deco historic district during high impact periods on Ocean Drive from 6th through 15th Streets, Washington Avenue from 6th through 17th Streets, Collins Avenue from 6th through 17th Streets, and on any portion of Lincoln Road.

(23) *Sidewalk cafes.* Commercial handbills shall not be distributed on the right-of-way:

a. Within 20 feet in any direction from the outside perimeter of any approved sidewalk cafe (as indicated in the approved site plan attached to the city-issued permit); and

b. On any right-of-way within the approved sidewalk cafe.

(31) *Beaches.* Commercial handbills shall not be distributed on any city beach east of the dunes.

\* \* \*

**SECTION 2. CODIFICATION**

It is the intention of the Mayor and the City Commission of the City of Miami Beach, and it is hereby ordained that the provisions of this Ordinance shall become and be made apart of the Code of the City of Miami Beach, Florida. The sections of this ordinance may be renumbered or re-

lettered to accomplish such intention, and the word "ordinance" may be changed to "section," "article," or other appropriate word.

## SECTION 3. REPEALER

All ordinances or parts of ordinances in conflict herewith be and the same are hereby repealed.

## SECTION 4. SEVERABILITY

If any section, subsection, clause or provision of this Ordinance is held invalid, the remainder shall not be affected by such invalidity.

## SECTION 5. EFFECTIVE DATE

**PASSED** and **ADOPTED** this ___ day of _____, 2014.

This Ordinance shall take effect on the ___ day of _____, 2014.

**ATTEST:**

_____
Philip Levine, Mayor

_____
Rafael E. Granado, City Clerk

<u>Underscore</u> denotes additions
~~Strike-through~~ denotes deletion

(Sponsored by Mayor Philip Levine)

APPROVED AS TO
FORM & LANGUAGE
& FOR EXECUTION

City Attorney *CM* Date 9/23/14

## Appendix 4
## ORDINANCE NO. <u>92-12</u>

AN ORDINANCE REPEALING SECTION 107.45-107.53, ESTABLISHING SECTION 94.01-94.10; REQUIRING PERMITS FOR OFF-PREMISE CANVASSING (OPC); PROVIDING DEFINITIONS; CREATING OPC ZONES; REQUIRING SET BACKS AND DISTANCES; PROVIDING FOR ENFORCEMENT; PROVIDING FOR SEVERABILITY; PROVIDING FOR REPEAL OF INCONSISTENT SECTIONS; PROVIDING AN EFFECTIVE DATE.

BE IT ENACTED by the City Commission of the City of Key West, Florida as follows:

Section 1. section 107.45-107.53, Code of Ordinances, City of Key West, is hereby repealed to read as follows (added language is <u>underlined</u>; deleted language is ~~struck through~~):

OFF-PREMISES CANVASSING

Sec. 94-01 Title.

Sections 94.01 through 94.10 inclusive shall be known as the off-premises canvassing ordinance.

Sec. 94.02 Definitions.

For the purposes of sections 94.01 through 94.10 inclusive, the Following words and terms shall have the meaning ascribed thereto:

(a). Business: Any commercial activity in which any real property, goods or services are sold or offered for sale,

performance for lease, or For rent within the corporate limits of the city as defined by the charter.

(b) City Manager: The City Manager of the City of Key West or designee.

(c) Edibles: Any food or beverage intended for human consumption.

(d) Goods: Any tangible item, including edibles.

(e) Historic District: all of that portion of the city of Key West located west of White Street between the Atlantic and Gulf of Mexico.

(f) Off-premises canvassing: distribution of information or solicitation of customers on a street, sidewalk, or other publicly owned right-of-way in connection with a business, excluding peddling as defined in section 107.01 and activities licensed pursuant to the mobile vendors ordinance, sections 107.25 through 107.37 inclusive.

(g) OPC: Off-premises canvassing.

(h) Solid Waste: Garbage, rubbish, refuse, bulky items and other discarded solid or liquid materials, including materials resulting from industrial, commercial, agricultural and community activities.

(i) Sale: Any trade or offer of trade for currency, credit, services, or goods.

(j) Services: Any work, attraction amenity or act rendered for sale.

Sec. 94.03 Application for permit; issuance.

(a) Each person who engages in off-premises canvassing shall apply to the licensing office of the building and zoning department for an OPC permit by submitting an application which shall set forth name, date of birth, business represented, and business address and telephone number. Proof of citizenship, permanent residence, or work permit shall be required.

(b) A nonrefundable permit fee of thirty dollars ($30.00) must be paid at the time of application.

(c) A photograph will be taken of each applicant and will be incorporated into the OPC permit.

(d) The licensing office upon receipt of a completed application and permit fee, shall verify that the business represented has a current occupational license from the City of Key West or another jurisdiction and upon such verification shall issue an OPC permit. No OPC permit shall be issued for a representative of an unlicensed business.

(e) Any OPC permit issued under § 107, City of Key West Code of Ordinances, will be valid for purposes of § 94.03 until the expiration date stated on the permit.

Sec. 44.04 Permit individual and non-transferable; limitation on number; renewal.

(a) The OPC permit is nontransferable, and shall be used only by the person in whose name it is issued. Any permit transfer shall render the permit void and ineffective. Any business sale, assignment (whether voluntary or involuntary), or transfer of over fifty (50) percent of the shares of any corporate business represented shall render the permit void and ineffective.

(b) A permit holder may represent more than one (1) business at a time, but must obtain a separate OPC permit for each business represented.

(c) No more than four (4) OPC permits will be issued per business.

(d) OPC permits are valid for one (1) year from date of issuance. An OPC permit holder may obtain renewal each year by applying to the licensing office, updating the required information, and paying a renewal fee of thirty dollars ($30.00). Any OPC permit not renewed

prior to expiration shall be deemed void and of no further use and effect to any person.

Sec. 94.05 Off-premises canvassing prohibited in certain locations.

No person shall engage in off-premises canvassing in the following locations:

(a) Any publicly owned parking lot;

(b) Mallory Dock, except that those artisans, vendors and performers authorized by the cultural preservation society to be present during the nightly sunset activities and participating in the drawing for the sixth (60) available spaces administered by the society shall be exempt from the requirements of this ordinances;

(c) Any publicly owned beach.

Sec. 94.06 Off-premise canvassing regulations in the Historic District

Any person engaging in off-premise canvassing in the Historic District shall abide by the following restrictions:

a) Off-premise canvassers on Duval Street are subject to the following setback requirements;

1) No OPC may operate on the public sidewalk of Duval Street between the Atlantic Ocean on the South and the Gulf of Mexico on the North or Front Street or on the public sidewalk within twenty-five (25) feet of any cross street where intersecting or bisecting Duval Street or Front Street.

2) No OPC may operate on the sidewalk or City owned property located on Wall Street, Exchange Street, Fitzpatrick Street, or the area known as Clinton Square including that portion of Whitehead Street between Green Street and Front Street.

b) OPC's on Whitehead street, Simonton Street, and cross streets between Whitehead Street, Duval Street and Simonton Street are subject to the following regulations when located between Angela

Street on the south and the Gulf of Mexico on the north.

1) OPC's operating on public sidewalks shall be located at street corners only.

2) No more than one (1) OPC of any one business may operate on the sidewalk within one hundred (100) feet of another OPC from the same business, located on public property; (c) A corner or street corner is defined to be the sidewalk or city right-of-way area where two or more platted or public streets meet, overlap, intersect or bisect, and the adjoining sidewalk area twenty-five (25) feet in either direction.

Sec. 94.07 Regulation of conduct.

All OPC permit holders shall comply with the following conditions while engaged in off-premises canvassing:

(a) The OPC permit holder shall wear the permit, including a photograph of the permit holder, located as on a shirt front pocket.

(b) No OPC permit holder shall obstruct vehicular traffic in violation of the provisions of Florida Statutes Chapter 316.

(c) No OPC permit holder shall place advertising materials upon any vehicle not belonging to said permit holder.

(d) No OPC permit holder shall throw, place or deposit solid waste on any street, sidewalk, or publicly owned right-of-way unless such solid waste is advertising material and is bundled and ready for distribution.

(e) No OPC permit holder shall interfere with or obstruct the free travel or passage of any pedestrian on the sidewalk.

(f) No OPC permit holder shall distribute printed literature except upon request of an interested party.

(g) No OPC permit holder operating on public property shall leave their area

of operation without forfeiting their right to operate in a given area.

Sec. 94.08 OPC permit not an occupational license.

Any OPC permit shall not be considered to be an occupational license or be equivalent to such license, nor to entitle the permit holder to rights provided in Florida Statutes Chapter 205.

Sec. 94.09 Unpermitted activity prohibited.

No person shall engage in off-premises canvassing unless the person holds a valid OPC permit and fully conforms to the terms of Codes sections 94.01 through 94.09 inclusive. Violations of these sections shall be punishable by a civil fine up to $500.00 and shall be enforceable as provided in section 1.13 (b).

Sec. 94.10 Regulatory Penalties.

(a) An OPC permit may be suspended or revoked on any of the following grounds:

(1) Fraud or misrepresentation of a material statement contained in the permit application.

(2) Failure by permit holder to comply with any of the provisions of sections 94.03 through 94.09 inclusive.

(3) Conduct by permit holder in connection with the permitted business in a manner which creates a public nuisance, or endangers the public health, safety or welfare.

(b) Upon one (1) judicial or code enforcement board finding of a violation of the terms of sections 94.03 through 94.09 inclusive, or other pertinent federal, state, or local law by a person holding a valid OPC permit, the pity manager shall, after conforming with paragraph (c) of this section, issue a written warning, and upon a second such judicial or code enforcement board finding impose a determinate suspension of the OPC permit, or revoke the OPC permit. Upon three (3) such judicial or code enforcement board findings regarding a particular business within one calendar year the city manager may revoke all OPC permits for the business involved. Judicial findings of violation shall include nolo contenders pleas and convictions whether or not adjudication is withheld.

(c) Before reaching any decision under paragraph (b) of this section, the city manager shall:

(1) Afford to the permit holder (or business, in the case of revocation of all permits for that business) notice of the violation charged, and a reasonable, informal opportunity to be heard;

(2) Consider the permit holders (or business, in the case of revocation of all permits for that business) past record of compliance with the provisions of this and related laws; and

(3) consider the degree of risk to public health, safety, and peace arising from the violation in evidence.

(d) The city manager's decision shall be rendered in writing and shall include notice to the operator of a right to appeal said decision to the city commission within then (10) days thereof. Appeals not filed in writing with the city clerk within said period shall be deemed waived and shall not be heard by the city commission.

(e) Any OPC permit revoked by the city manager pursuant to this section shall immediately be void and of not further use and effect to any person, including during the pendency of any appeal. Persons and businesses having OPC permits revoked may reapply for new OPC permits upon the expiration of a period of one (1) year from the date of revocation.

**Section 2.** All Ordinances or parts of Ordinances of said City in conflict with the

provisions of this Ordinance are hereby superseded to the extent of such conflict.

**Section 3.** If any section, provision, clause, phrase, or application of this ordinance is held invalid or unconstitutional for any reason by any court of competent jurisdiction, the remaining provisions of this ordinance shall be deemed severable therefrom and shall be construed as reasonable and necessary to achieve the lawful purposes of this ordinance.

**Section 4.** This Ordinance shall go into effect immediately upon its passage and adoption and authentication by the signatures of the presiding officer and the Clerk of the Commission.

. Read and passed on first reading at a regular meeting held this 3rd day of March, 1992.

Read and passed on final reading at a regular meeting held this 17th day of March, 1992.

DENNIS J. WARDLOW, MAYOR

ATTEST:

JOSEPHINE PARKER, CITY CLERK

## ORDINANCE NO. 92-25

AN ORDINANCE AMENDING SECTION 94.06 REQUIRING PERMITS FOR OFF-PREMISE CANVASSING (OPC) IN THE HISTORIC DISTRICT; PROVIDING FOR SEVERABILITY; PROVIDING FOR REPEAL OF INCONSISTENT SECTIONS; PROVIDING AN EFFECTIVE DATE.

BE IT ENACTED by the City Commission of the City of Key West, Florida as follows:

**Section 1.** Section 94.06 of the City of Key West Code of Ordinances is hereby amended to read as follows deleted language is struck through; added language is underlined):

Sec. 94.06

Any person engaging in off-premise canvassing in the Historic District shall abide by the following restrictions:

(a) off-premises canvassers on Duval Street, Front Street, streets intersecting or bisecting said streets, Wall Street, Exchange Street, Fitzpatrick Street, or Clinton Square are subject to the following setback requirements:

1) No OPC may operate on the public right-of-way (whether street, sidewalk, or other portion of said right-of-way) of Duval Street between the Atlantic Ocean on the South and the Gulf of Mexico on the North, or on the public right-of-way (whether street, sidewalk, or other portion of said right-of-way) of Front Street, or on the public right-of-way (whether street, sidewalk, or other portion of said right-of-way) of any cross street where intersecting, or bisecting Duval Street or Front Street.

2) No OPC may operate on the public right-of-way (whether street, sidewalk,

or other portion of said right-of-way) City owned property located on of Wall Street, Exchange Street, Fitzpatrick Street, or the area known as Clinton Square including that portion of Whitehead Street between Green and Front Street.

(b) OPC's on Whitehead Street, on Simonton Street, and on cross streets between Whitehead Street, and Duval Street and between Duval Street and Simonton Street are subject to the following regulations when located between Angela Street on the south and the Gulf of Mexico on the north.:

1) OPC's operating may operate on public sidewalks, but they shall be located at street corners only. No OPC shall operate on the street or other portion of the public right-of-way.

2) No more than one (1) OPC of any one business may operate on the sidewalk within one hundred (100) feet of another OPC from the same business, where both such OPC's are located on public property;. .

(c) A corner or street corner is defined for purposes of this section to be sidewalk or city right-of-way area where two or more platted or public streets meet, overlap, intersect or bisect, and the adjoining sidewalk area or unpaved right-or-way area serving as a sidewalk, but not including the street, extending twenty-five (25) feet in either direction.

Section 2. All Ordinances or parts of ordinances of said City in conflict with the provisions of this ordinance are hereby superseded to the extent of such conflict.

Section 3. If any section, provision, clause, phrase, or application of this ordinance is held invalid or unconstitutional for any reason by any court of competent jurisdiction, the remaining provisions of this ordinance shall be deemed severable therefrom and shall be construed as reasonable and necessary to achieve the lawful purposes of this ordinance.

Section 4. This Ordinance shall go into effect immediately upon its passage and adoption and authentication by the signatures of the presiding officer and the Clerk of the Commission.

Read and passed on first reading at a regular meeting held this 19th day of May, 1992.

Read and passed on final reading at a regular meeting held this 2nd day of June, 1992.

DENNIS J. WARDLOW, MAYOR
By James F. Weekley
Mayor pro tempore

ATTEST:

JOSEPHINE PARKER, CITY CLERK